## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jacquelyn J. Loiselle,                                  Civil No. 07-2201 (PAM/JJG)

      Plaintiff,

                                          **REPORT**
v.                                                              **AND**
                                                        **RECOMMENDATION**
Michael J. Astrue,

      Defendant.

JEANNE J. GRAHAM, United States Magistrate Judge

In this matter, plaintiff Jacquelyn Loiselle seeks judicial review of the final decision of the Commissioner of Social Security, who denied an application for disability benefits under the Social Security Act. Ms. Lutz is represented by Fay E. Fishman, Esq. The Commissioner is represented by Lonnie F. Bryan, Assistant U.S. Attorney. The parties bring cross-motions for summary judgment (Doc. Nos. 6, 9), which are referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1(a).

In her application for disability benefits, Ms. Loiselle (Loiselle) asserted that she has a degenerative disc disease, causing her to suffer severe pain and headaches. After this claim was denied initially and on reconsideration, Loiselle demanded a hearing before an Administrative Law Judge (ALJ). The ALJ denied benefits, ruling that Loiselle's impairment was not so severe to preclude her from work. In making this decision, the ALJ gave reduced weight to evidence from Loiselle's treating neurologist, as well as Loiselle's own testimony regarding her pain. The parties now dispute whether the decision is supported by substantial evidence.

I.    **BACKGROUND**

A.    **The First Automobile Accident:  February 1996 to October 2001**

The relevant events here are traceable to February 1996, when Loiselle was involved in an automobile accident.  The record does not say what treatment Loiselle received in the months following the accident, as the medical notes in the record only date back to November 1998.  But the record indicates that, after the accident, Loiselle reported chronic neck pain and headaches. (*See* Tr. at 120, 189.)

On November 12, 1998, Loiselle received an initial consultation from an orthopedist, Dr. Matthew Monsein, M.D.  At that visit, Loiselle reported headaches and numbness in her arms, as well as headaches that were exacerbated by intense light.  From a physical examination, Monsein found that Loiselle had a limited range of motion in her neck, and that her neck and jaw muscles were tender and sensitive.  He found no other problems, observing that Loiselle's movement and sensation were normal.  (Tr. at 120.)

Monsein did not participate any further in Loiselle's treatment after that visit.  One of his colleagues and another orthopedist, Dr. Todd Holmes, M.D., took over her treatment at that time. Visiting him on March 8, 1999, Loiselle again reported neck pain and headaches, but it does not appear Holmes conducted an intensive physical exam.  (*See* Tr. at 117.)  But Holmes did refer Loiselle to Dr. Mary Jane Chiasson, D.O., a neurologist.  (*See* Tr. at 199.)  In the ensuing years, Chiasson was more involved than any other physician in Loiselle's treatment.

Loiselle first visited Chiasson on March 15, 1999.  After Loiselle reported her symptoms, Chiasson reviewed some radiological images of Loiselle's neck, finding some atrophied muscles there.  Chiasson also conducted a physical exam.  Unlike Holmes, Chiasson found no tenderness

in the neck or problems with range of motion.  Chiasson also did not observe any problems with movement or sensation.  (Tr. at 199-200.)

After reviewing additional scans, Chiasson focused on evidence of bulging discs in the cervical spine.  (*See* Tr. at 195-96.)  When examining Loiselle in April and May 1999, Chiasson did not identify any further problems with motion or sensation.  (Tr. at 192, 193, 195.)

Loiselle visited Holmes again on May 3, 1999.  At that visit, she continued to report the same symptoms, adding that she was taking ibuprofen for the pain.  In his examination, Holmes found that Loiselle had some tenderness and deformities in her neck, as well as some difficulties with her range of motion.  (Tr. at 114-15.)

Another orthopedist, Dr. Robert Roach, M.D., became involved in Loiselle's treatment in June 1999.  Examining Loiselle at a visit on June 23, 1999, his observations were consistent with those by Holmes and Chiasson.  He indicated that Loiselle reported pain, and that her neck was tender, but otherwise found no problems with motion or sensation.  Based on prior scans, Roach also determined that Loiselle had some degeneration in her cervical discs.  Roach concluded that Loiselle had "significantly disabling" pain and proposed another diagnostic procedure, a cervical discography.  (Tr. at 189-90.)

Briefly put, discography involves placing a needle into the disc and making an injection.  Based on the amount of pressure applied during the injection, the radiologist can observe which discs cause pain and whether the pain is consistent or inconsistent with other pain reported by the patient.  The injection often includes a chemical that, with a radiological scan, allows a doctor to observe the shape of the disc as well.

A radiologist, Mark Myers, M.D., took a cervical discogram of Loiselle on July 9, 1999.  He found degeneration in some of her cervical discs, but also noted her pain was nonconcordant,

meaning that the pain she felt during the procedure was not consistent with what she reported in her prior examinations.  (Tr. at 154.)

For the remainder of 1999, there is little indication that the treating doctors took further action on Loiselle's neck pain or headaches.  The only evident trend, if any, was increasing pain. In visits with Roach on July 14, 1999 and October 27, 1999, he continued to observe tenderness in Loiselle's neck.  (Tr. at 148, 149.)  Visiting her primary care physician on October 14, 1999, Loiselle said that a prescribed anti-inflammatory medication was not helping, and her physician recommended another drug.  (Tr. at 274.)

Chiasson pursued some new pain management options in the early months of 2000.  At a visit on March 20, 2000, Chiasson noted that Loiselle had tightened neck muscles and continuing problems with range of motion.  As Loiselle had reported side effects from narcotics, Chiasson attempted some other forms of pain management, injecting a steroid Loiselle's neck and giving her another anti-inflammatory to try.  (Tr. at 184.)  Shortly thereafter, on April 3, 2000, Loiselle returned and reported a severe adverse reaction to the injection.  At that visit, Chiasson observed substantial weakness in Loiselle's neck muscles.  (Tr. at 182.)

Loiselle next visited Chiasson on May 15, 2000.  In addition to the previous complaints, Chiasson reported lower back pain.  (Tr. at 180.)  At visits on June 5, 2000 and June 19, 2000, Chiasson examined the lumbar spine and found some misalignment.  (Tr. at 178, 180.)

Scans of the lumbar spine, however, did not confirm this diagnosis.  A radiologist, John Steely, M.D., conducted scans of Loiselle on October 17, 2000.  He found a congenital defect, a conjoined root sleeve, that he thought was "within normal limits"; and elsewhere he noted some degeneration of spinal connective tissue.  But his general conclusion was that the lumbar spine was normal.  (Tr. at 221, 222.)

At a visit on December 7, 2000, Chiasson refocused on Loiselle's neck, again observing tenderness there.  (Tr. at 174.)  She ordered further scans of that area.  Based on those scans, she was unable to locate atrophied neck muscles, but she observed that bulging in the cervical discs had worsened.  In her notes from a visit on January 11, 2001, Chiasson diagnosed Loiselle with degenerative disc disease.  (Tr. at 172, 219.)  Following a scan on April 7, 2001, a radiologist confirmed this diagnosis, observing further degeneration of the cervical discs.  (Tr. at 264.)

Chiasson referred Loiselle to an orthopedic surgeon, Gregg Dyste, M.D., who performed a fusion of three cervical vertebrae on April 30, 2001.  (Tr. at 132-34.)  When Loiselle returned to Dyste for a follow-up on May 29, 2001, she said her headaches were significantly improved.  Dyste examined Loiselle and found normal strength and sensation in her neck.  (Tr. at 145.)

Loiselle visited Chiasson for the first time after the surgery on July 26, 2001, saying her headaches were much improved and that she was managing her pain with ibuprofen.  The exam notes do not indicate whether Chiasson performed a physical examination, but Chiasson did note that Loiselle had improved range of motion in her lower back.  (Tr. at 169.)

Loiselle did not receive much further attention for the remainder of 2001.  When Loiselle visited Dyste on October 23, 2001, she reported that her work as a massage therapist caused her pain to get worse.  Dyste responded by telling Loiselle to stop doing that work.  (Tr. at 143.)

### B.       The Second Automobile Accident:  January 2002 to September 2003

Loiselle was involved in a second automobile accident on January 25, 2002.  She visited Chiasson on January 29, 2002, reporting pain in her neck, back, and limbs.  Chiasson examined Loiselle, finding full strength and range of motion in her limbs, and no other issues with her gait or reflexes.  (Tr. at 166.)

At subsequent appointments, Loiselle reported increasing concerns.  After visiting Dyste on February 12, 2002, he observed that Loiselle had a normal range of motion but also some problems with gait.  According to Dyste, Loiselle was suffering "increasingly severe symptoms" that could not be treated through further surgery.  (Tr. at 138.)

Chiasson referred Loiselle for some additional scans.  One scan of the spine, on February 28, 2002, revealed "minimal bulging" in a disc above the site of the fusion.  But the radiologist, Anthony Cook, M.D., did not find the results of the scan remarkable.  (Tr. at 215.)

Loiselle received another cervical discogram on March 19, 2002.  The radiologist, David Schultz, M.D., found some pain originated from the cervical discs above the site of the fusion, including the new pain that Loiselle had reported since the second accident.  Schultz diagnosed Loiselle with degenerative disc disease in her cervical spine.  (Tr. at 211-13.)  Being advised of these results, Chiasson concluded that there was a bulging disc in the cervical spine.  (Tr. at 163.)

Chiasson ordered a scan of Loiselle's lumbar spine as well.  Cook scanned it on April 11, 2002, but did not observe any problems.  (*See* Tr. at 209.)

At a visit with Dyste on April 16, 2002, Loiselle described pain in her neck and limbs, which intensified during activities like cleaning.  Dyste did not confirm her report.  When Dyste examined Loiselle, he found she had limited motion in her neck but full motion in her limbs.  He also noted some difficulty testing for strength, perhaps due to her pain.  According to Dyste, "[i]t seems as if the strength is okay and then she has breakaway weakness."  (*See* Tr. at 140-41.)

Around this time, Chiasson and other physicians were also working with Loiselle on pain management.  Chiasson prescribed another anti-inflammatory on April 9, 2002.  (Tr. at 163.)  At a visit on May 15, 2002, after Loiselle suffered a severe reaction from a narcotic patch, Chiasson

noted, "We have tried all sorts of pain medicines . . . and really, she has had reactions to all of them and has not done well."  (Tr. at 161.)

At a visit with Chiasson on August 28, 2002, Loiselle reported increasing pain in her left leg and hip.  (Tr. at 160.)  Chiasson ordered a scan; the result was normal.  (Tr. at 159, 207.)  But Loiselle's pain evidently continued to intensify.  When Loiselle visited Chiasson on October 10, 2002, Chiasson described it as "exquisite"; and when Loiselle visited Dyste on October 29, 2002, Dyste described it as "excruciating."  (Tr. at 139, 157.)  Dyste was unable to ascertain the source of the pain, but he took note of the discogram from March 2002.  (*See* Tr. at 157.)

Over the next year, there is little indication of progress in the physicians' efforts to treat Loiselle.  The radiologists, Cook and Steely, respectively performed scans on November 4, 2002 and February 17, 2003.  They did not observe problems with Loiselle's spine.  And when Steely compared the February 2003 scan with the prior scan from February 2002, he did not find any indication that Loiselle's condition was worsening.  (Tr. at 202, 204, 361.)

Chiasson also did not gain further insight into Loiselle's condition.  After Loiselle visited on December 13, 2002, Chiasson noted that Loiselle's pain in her limbs was "quite a bit worse." Chiasson conducted an examination, continuing to find stress in Loiselle's lumbar spine, but was unable to ascertain the cause.  (Tr. at 155.)  Loiselle returned on February 28, 2003, reporting that her pain was worse.  The record does not state whether Chiasson examined Loiselle at the time.  But Chiasson did note,

> I also gave [Loiselle] a note that explains why she is not able to work and that I have requested that she is not able to do even household chores.  This is for a legal issue that does not relate to her medical situation.

(Tr. at 345.)

Loiselle then embarked on a course of physical therapy with Mark Bookhout, M.S.  At the initial consultation on April 28, 2003, Bookhout examined Loiselle, finding she had difficulty with balance and limited range of motion in the spine, as well as some tenderness in the cervical spine.  (Tr. at 230-31.)  After eight sessions, Bookhout discharged Loiselle on June 23, 2003.  He found that Loiselle had significant improvement, with nearly full and pain-free movement in her cervical spine, with residual pain and numbness elsewhere.  He opined that Loiselle was capable of managing her own exercise program afterwards.  (Tr. at 228-29.)

Meanwhile, Loiselle visited her personal physician on June 3, 2003.  Loiselle reported some pain in her limbs and back, and she asserted she was unable to work.  But she alluded to gardening, implying that she would do so until her hands became numb.  Loiselle also mentioned she was doing some occasional exercise, such as walking, bicycling, and swimming.  The record does not indicate whether the physician conducted a physical examination.  (Tr. at 247.)

At their next visit on August 6, 2003, Loiselle continued to report neck and back pain.  Once again, Chiasson evidently did not examine Loiselle.  Chiasson only noted that the physical therapy had been successful.  (Tr. at 344.)

When Loiselle returned on September 16, 2003, her condition was evidently much worse.  Loiselle said that, about two weeks before the appointment, her pain and headaches substantially increased.  Chiasson observed, at the outset, that Loiselle "appeared to be very uncomfortable."  From an examination, Chiasson found Loiselle had good strength, but problems with numbness and pain, in her arms and hands.  Chiasson attributed the changes to the progression of Loiselle's degenerative disc disease, and she ordered another scan of Loiselle's cervical spine to check this diagnosis.  (Tr. at 341.)

That same day, Chiasson also sent a letter to an attorney who was representing Loiselle in connection with the January 25, 2002 automobile accident.  In the letter, Chiasson opined that Loiselle suffered a permanent injury from the accident, and that she would have neck pain, back pain, and headaches for the rest of her life.  Due to these issues, Chiasson wrote, Loiselle had difficulties with posture and coordination and was no longer able to perform her past work as a massage therapist.  Chiasson described Loiselle's complaints as "reliable and consistent," adding that Loiselle had poor tolerance for pain medication and difficulties with pain management.  (Tr. at 343.)

Cook scanned Loiselle's cervical spine again on September 19, 2003.  Other than noting the "minimal" disc bulging above the site of the fusion, Cook found no changes from the prior scan in February 2003.  (Tr. at 359.)

**C.      After the Disability Benefits Application:  April 2004 to April 2006**

Loiselle filed her application for disability benefits on April 20, 2004, which was denied initially on June 17, 2004.  (*See* Tr. at 29.)

As the application was pending, Loiselle's ability to work was assessed by Cliff Phibbs, M.D., in a report on June 15, 2004.  The record does not indicate why Phibbs performed the assessment or whether he examined Loiselle.  Phibbs opined that Loiselle could lift fifty pounds occasionally and twenty-five pounds frequently; that she could sit up to six hours of an eight-hour work day; and that she had few manual or postural limitations, except for pushing and pulling above her head.  (Tr. at 309-12.)

Loiselle visited Chiasson twice in June 2004.  The record does not say whether Chiasson examined Loiselle during either visit; it appears that they spent these visits discussing Loiselle's condition and prognosis.  At a visit on June 1, 2004, Loiselle stated that she was not taking any

pain medications.  And at a visit on June 24, 2004, Loiselle said she was "at the end of her rope."

Chiasson again noted that Loiselle appeared to suffer side effects from most pain medications.

(Tr. at 337, 339.)

Loiselle received an initial consultation with another orthopedist, Dr. Timothy Garvey, on

August 2, 2004.  After examining Loiselle, he found that she had limited range of motion in her

cervical spine, but that her lumbar spine was normal.  Garvey also determined that her gait was

"reasonably normal" and that she had some deficiencies with reflexes and sensation.  Citing the

March 2002 discogram, Garvey diagnosed Loiselle with degenerative disc disease and attributed

her pain to the disease.  (Tr. at 323-24.)

Cook performed another scan, this time of Loiselle's lumbar spine, on August 9, 2004.

He found a bulging disc there, observing that this problem had developed since the last scan of

Loiselle's lumbar spine in April 2002.  Cook determined, however, that the bulging disc did not

impact any nerve roots in that area.  (Tr. at 355.)

Loiselle's application was denied on reconsideration on October 18, 2004.  She requested

a hearing before an ALJ on November 26, 2004.  (Tr. at 31, 43.)

When Loiselle next visited Chiasson, on December 2, 2004, Chiasson noted that Loiselle

was "really not doing very well," reporting pain and headaches.  When attempting to compress

Loiselle's leg and hip, Chiasson observed, Loiselle "nearly came off the table."  Chiasson also

examined Loiselle, finding problems with gait and motion, including difficulty with sitting and

standing.  Chiasson also observed that, even though narcotics were prescribed for pain control,

Loiselle was not taking them.  (Tr. at 331.)

Another radiologist, Geoffrey Raile, M.D., scanned Loiselle's hip and leg on December 8, 2004.  He found some arthritic degeneration there, but also noted that the result was no worse than the last scan of the area in August 2002.  (Tr. at 351-52.)

Schultz performed a discogram on Loiselle's lumbar spine on February 1, 2005.  He found that three lumbar discs produced pain consistent with what Loiselle had reported.  Much as Steely had observed in October 2000, Schultz observed a congenital defect that was not an issue, but separately noted a possible tear in some spinal connective tissue.  (Tr. at 303.)  Another radiologist confirmed the presence of the tear in a scan on February 8, 2005.  (Tr. at 350.)

Loiselle returned to Garvey for another visit on February 14, 2005.  After considering the recent scans of her lumbar spine, Garvey proposed a nerve block at the offending lumbar disc, saying that the procedure would identify the source of the pain and allow him to assess whether surgery was appropriate.  (Tr. at 321-22.)  Loiselle received the nerve block on April 18, 2005 and reported complete relief in her lower back.  (Tr. at 328.)  At that point, however, Loiselle did not plan surgery.

In the meantime, Cook scanned Loiselle's spine two more times, on February 8, 2005 and April 20, 2005.  Cook found no significant change from his prior scans and did not identify any causes for concern.  (Tr. at 346-48.)

In anticipation of the upcoming hearing before the ALJ, Loiselle obtained several reports from Chiasson regarding Loiselle's ability to work.  Chiasson completed two reports on May 10, 2005.  In general, Chiasson stated that Loiselle suffered from degenerative disc disease, causing daily, severe pain and headaches, and that Loiselle was not a malingerer.  (*See* Tr. at 364-65, 368, 369.)

Regarding Loiselle's physical condition, Chiasson opined that Loiselle can only walk half a block without pain; cannot sit or stand for more than ten minutes at a time, and no more than two hours of an eight-hour workday; and had major postural limitations and cannot perform fine manual tasks.  Chiasson added that Loiselle has difficulty concentrating, that she would require frequent breaks and was unable to perform even low stress jobs, and that her pain would cause her to miss work more than four times per month.  (Tr. at 366, 369-73.)

After the procedures in April 2005, Loiselle did not receive further treatment until August 2005.  She visited Chiasson on August 24, 2005 and December 12, 2005, reporting severe pain, but Chiasson evidently did not conduct further examinations or suggest a treatment.  (Tr. at 378, 380.)  Cook performed another scan of the cervical spine on December 23, 2005, but again found no significant changes.  (Tr. at 376.)

Loiselle returned to Garvey for a visit on December 19, 2005.  Through an examination, Garvey found that Loiselle had an abnormal gait and leg pain, but no issues with strength.  Based on the scans of February 2005, and the successful nerve block in April 2005, Garvey discussed possible surgery on Loiselle's lumbar spine.  (Tr. at 582-83.)  Garvey took some additional scans of her lumbar spine on January 6, 2006 and January 18, 2006, concluding there was a "sharply circumscribed" nerve sleeve there.  (Tr. at 375.)

Garvey performed the surgery, removing a portion of connective tissue from Loiselle's lumbar spine, on February 10, 2006.  (Tr. at 445.)  According to the discharge notes that Loiselle received after the surgery, she was directed not to lift more than ten pounds until she saw Garvey again, in another four to six weeks.  (Tr. at 483.)

Although Loiselle visited Chiasson on February 27, 2006, Chiasson did not examine Loiselle or opine about the surgery in her notes.  (Tr. at 374.)  The record further indicates that

Loiselle visited her primary care physician on April 6, 2006, regarding an unrelated complaint. Other than noting that "[b]ack [was] still with pain since surgery," the visit offers no insight into how Loiselle fared after the surgery.  (Tr. at 383.)  The record has no medical information beyond this point.  It is unknown, therefore, whether Loiselle had a surgical follow-up with Garvey or what her prognosis was.

### D.     The Hearing Before and Decision by the ALJ

On August 2 and 3, 2006, a week before the hearing before the ALJ, Chiasson completed another set of reports regarding Loiselle's ability to work.  In these reports, Chiasson generally made the same assessment as in her reports from May 10, 2005, again indicating profound limits on Loiselle's ability to work.  (*See* Tr. at 585-94.)

The hearing before the ALJ took place on August 9, 2006.  In her testimony, Loiselle said the lumbar surgery was "tough."  Though she noted some improvement since then, Loiselle was continuing to suffer pain, which inhibited both her sleep and her daily activities.  She added that she suffered side effects from most pain medications, and her efforts at pain management were ineffective.  (Tr. at 605, 616, 624.)

Loiselle explained that she tried to exercise, bicycling a mile or two when possible.  She added that she does some light household tasks, such as cooking or cleaning, but on bad days she did nothing.  She asserted that she did not spend time with friends or do activities for fun.  (Tr. at 609, 615-16, 621, 626-27.)

The ALJ also received testimony from a forensic medical expert, Andrew Steiner, M.D. From his review of Loiselle's medical records, Steiner opined that the surgeries were successful and that Loiselle had no significant limitations on her posture, her ability to sit or stand, or her range of motion.  He added that there was no objective medical condition that may have caused

the limits Loiselle claimed.  The only limit Steiner proposed was that Loiselle not lift more than ten pounds.  (Tr. at 630-31.)

The ALJ then presented a hypothetical to a vocational expert, William Rutenbeck.  In the hypothetical, the ALJ described a person who can lift ten pounds occasionally and five pounds frequently; who can do overhead and postural work occasionally; and who otherwise performs sedentary work.  The ALJ also specified that there were no limits on sitting or standing, but that the person could walk up to thirty minutes at a time, up to two hours in an eight hour workday. (Tr. 634-35.)  Rutenbeck concluded that such a person could obtain employment for jobs such as office helper, information clerk, and security system monitor.  (Tr. at 636-37.)

The ALJ issued a decision on October 19, 2006.  Describing Loiselle's medical history after the first automobile accident, the ALJ found that the spinal fusion was successful.  The ALJ focused on the visits with Dyste, and that after the surgery, Dyste generally described Loiselle's strength, sensation and range of motion as normal.  The ALJ said little about the impact of the second accident, except to say that Loiselle received successful physical therapy from Bookhout. (Tr. at 20-21.)

Without further discussing Loiselle's medical history from 2003 and 2004, the ALJ then turned to the events leading to the lumbar surgery.  In this area, the ALJ did not mention most of the treatment Loiselle received, but did mention that Cook had taken several scans of the cervical spine that showed no cause for concern.  He also cited a preoperative physical Loiselle received before the surgery, in which the examining physician found no problems with gait, reflexes, or sensation.  (Tr. at 21-22.)

Based on this review, the ALJ adopted the opinion of Steiner.  Discounting the reports by Chiasson, the ALJ stated that "they appear to be based largely on the claimant's own reports of her symptoms and pain."  (Tr. at 23.)

The ALJ then turned to Loiselle's description of her pain and the impact of this pain on her ability to work.  Describing her daily activities, the ALJ found that Loiselle exercised when she was able, by walking, swimming, and bicycling.  The ALJ also found that Loiselle did light housekeeping, like cooking and cleaning, and had no problems with personal care or grooming. And the ALJ further determined that Loiselle suffered no side effects from pain medications, and to the extent she required them, they did not inhibit her ability to work.  Based on these findings, the ALJ concluded that Loiselle overstated the intensity and duration of her pain, and it did not significantly impair her ability to work.  (Tr. at 24.)

 Citing Steiner's opinion, the ALJ determined that the vocational hypothetical accurately described Loiselle's ability to work.  The ALJ thus adopted Rutenbeck's opinion and found that Loiselle was able to work, ruling that she was not disabled and thus did not qualify for disability insurance.  (Tr. at 25.)  Loiselle has since exhausted her appeals before the SSA and now seeks judicial review.  (*See* Tr. at 12.)

## II.   ANALYSIS

When asked to review the findings of an ALJ in this context, a court examines whether the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir. 2004).  Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

When assessing whether there is substantial evidence, a court must consider the evidence that supports, and that which contradicts, the findings of the ALJ. *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998). If more than a scintilla of evidence supports the findings, they must be upheld, even though substantial evidence might also support a contrary outcome. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001).

**A.      Opinions of Treating and Non-Treating Physicians**

Loiselle contends the ALJ gave undue weight to the opinion of a non-treating physician, Steiner, and insufficient weight to the statements of her treating physicians. The Commissioner responds that Steiner's opinion was supported by evidence in the medical records, whereas those records contradicted the opinions of Chiasson and some of the other treating physicians.

The parties present two discrete issues. The first is whether the ALJ improperly relied on the opinion of a non-treating physician; the other is whether the ALJ improperly discounted the opinion of a treating physician. Each of these questions merits separate discussion in turn.

An ALJ cannot rely on the opinion of a non-treating physician, by itself, as substantial evidence. But such an opinion may help provide substantial evidence where other evidence in the record supports the opinion of that physician. *Coleman v. Astrue*, 498 F.3d 767, 772 (8th Cir. 2007); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

In determining that Loiselle was able to work, the ALJ chiefly relied on Steiner's opinion that Loiselle had a successful spinal fusion and had generally recovered. But this finding lacks relevant and meaningful support in the record.

Focusing on Loiselle's post-surgical visits with Dyste in 2001, the ALJ determined that Loiselle had normal strength, sensation and range of motion. Though this finding is accurate, it does not demonstrate that Loiselle had fully recovered, or that her rehabilitation was lasting. To

the contrary, when Loiselle returned to Dyste in 2002, he observed other problems, culminating in his finding in October 2002 that Loiselle was suffering from "excruciating" pain.

Steiner's opinion also fails to meaningfully account for the injuries and pain that several physicians confirmed following the January 2002 accident. To support Steiner's opinion, the ALJ observed that Cook had taken several scans of Loiselle's spine without finding problems. But nothing in the record connects these results to Loiselle's rehabilitation from her surgery, or to her complaints following the second accident. Neither Cook—who only performed scans and did not directly treat Loiselle—nor the treating physicians inferred that the scans were proof of Loiselle's rehabilitation.

The ALJ alludes to some of Garvey's notes, in the year leading up to the lumbar surgery, in which Garvey finds no problems. But this finding takes the notes out of their context. Garvey observed that Loiselle had problems with gait and sensation, and he was sufficiently impressed that he recommended and ultimately performed the lumbar surgery. No reasonable assessment of Garvey's notes can support the ALJ's findings, and for this reason, his notes do not support Steiner's opinion.

The only other material record cited by the ALJ to support Steiner's opinion is an exam note from February 6, 2006. At a preoperative physical that day, the physician determined that Loiselle had normal strength and sensation. These findings, made by a non-specialist only four days before the lumbar surgery, cannot reasonably support a conclusion that Loiselle was substantially rehabilitated. (*See* Tr. at 387.) For that matter, the record has no information about how Loiselle did after her lumbar surgery.

To the extent the ALJ cited medical records to support Steiner's opinion, the records are not such relevant evidence that reasonably supports the ALJ's conclusions. So Steiner's opinion

is not supported by medical evidence in the record, and thus this opinion cannot by itself provide substantial evidence on Loiselle's ability to work.

In his arguments for summary judgment, the Commissioner cites the June 2004 report by Cliff Phibbs.  The ALJ notes the report in passing, without reciting its findings or mentioning the author by name.[1]  (*See* Tr. at 23.)

There is no indication that Phibbs examined Loiselle or that his assessment of her ability to work is based on medical records.  Perhaps for these reasons, the ALJ did not discuss Phibbs' report, and the ALJ's vocational hypothetical significantly departs from it.  Because Phibbs is a non-treating physician, and because there is no indication that his report is supported by medical evidence, his report cannot supply substantial evidence and it does not alter the analysis here.

Turning to the treating physicians, their opinions are given controlling weight so long as they are well-supported by medically acceptable evidence.  *Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004).  An ALJ may discount a treating physician's opinion, however, where it is a conclusory statement unsupported by any evidence; where it is contradicted by other statements of the same physician; or where other physicians' opinions are supported by superior evidence. *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008).  When an ALJ discounts the opinion of a treating physician, the ALJ must give good reasons for doing so.  *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001).

The ALJ discounted Chiasson's statements here because "they appear to be based largely on the claimant's own reports of her symptoms and pain."  But the ALJ did not recite evidence to support this contention.

---

[1]      Although the ALJ implies that there was more than one report by "state agency doctors," the ALJ evidently refers to Phibbs' report, which was approved by a supervising physician.

The record indicates that Chiasson treated Loiselle extensively over a seven-year period. During this relationship, Chiasson often physically examined Loiselle.  When Chiasson could not ascertain the cause of Loiselle's problems, Chiasson consulted with other physicians and ordered various types of radiological scans.  From this record, there is no reasonable basis for the ALJ to find that Chiasson largely reiterated Loiselle's own complaints.

The ALJ otherwise fails to say how the reports or statements of Chiasson are deficient, or how other medical records compel a different conclusion.  Because the ALJ has not given good reasons to discount the assessments of Chiasson, a treating physician, the ALJ's findings in this area are not supported by substantial evidence either.

### B.      Assessment of Complaints of Subjective Pain

Loiselle also argues that, when the ALJ discounted her complaints of subjective pain, the ALJ's findings were not supported by substantial evidence.

An ALJ may not disregard complaints of subjective pain by a claimant, even where those complaints are not supported by medical evidence.  *Melton v. Apfel*, 181 F.3d 939, 941 (8th Cir. 1999).  Where the complaints are inconsistent with medical evidence and the record as a whole, however, an ALJ has good cause to find that the claimant is not credible.  *Baker v. Barnhart*, 457 F.3d 882, 892-93 (8th Cir. 2006); *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005).

The Eighth Circuit decision of *Polaski v. Heckler* states that, when determining whether complaints of subjective pain comport with the record, at least five factors shall be considered. 739 F.2d 1320, 1322 (8th Cir. 1984) (adopting 20 C.F.R. § 404.1529(c)(3)).  These factors include, but are not limited to, the claimant's daily activities; the duration, intensity, and severity of the pain; precipitating and aggravating factors; the dosage and effectiveness of medication; and whether the pain causes functional restrictions.  *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th

Cir. 2007).  An ALJ need not expressly cite *Polaski* so long as the ALJ's decision shows that the ALJ considered all these factors.  *Molley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001).

When assessing the claimant's daily activities, and whether pain causes the claimant to suffer functional restrictions, the pain need not be so disabling that it precludes all productive activity.  For this reason, the fact that a claimant performs some light housekeeping, by itself, is not enough to rebut the claimant's complaints of subjective pain.  *Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008); *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007).

The ALJ's decision reflects that the ALJ duly considered all of the *Polaski* factors when assessing Loiselle's complaints of subjective pain.  The question here is whether, when the ALJ applied those factors, the findings of the ALJ were supported by substantial evidence.

Regarding Loiselle's daily activities, the ALJ found that Loiselle exercised when she was able; performed light housekeeping; and had no problems with personal care.  But these findings, which contradict Loiselle's testimony at the hearing before the ALJ, is almost entirely premised on statements Loiselle made in June 2003.  The record otherwise does not say whether Loiselle was able to perform any of these activities on a daily basis, or even whether she could sustain her activities for more than a few hours.

The ALJ also found that, to the extent Loiselle needed medications for pain management, such medications caused no side effects and did not significantly impair her ability to work.  This finding has no relevant support in the record.  With the exception of ibuprofen, which was only effective for less severe pain, the record indicates that Loiselle tried several pain medications to no avail.  The record also shows that Loiselle suffered substantial side effects from steroids and narcotics, if she was not entirely allergic to them.

Assuming for the sake of argument that the record supports the ALJ's findings regarding Loiselle's daily activities, those activities do not appear to be enough to show that Loiselle had no functional limitations. That Loiselle did some housekeeping, and exercised intermittently, is not enough to rebut her complaints of pain. *Cf. Ford*, 518 F.3d at 983. And there is no evidence to support the ALJ's finding that Loiselle could manage her pain without undue side effects. For these reasons, when the ALJ assessed Loiselle's subjective complaints of pain, this determination was not founded on substantial evidence.

On this point, in his arguments for summary judgment, the Commissioner calls attention to the note by Chiasson from February 2003. To review, Chiasson alludes to a note in which she states that Loiselle is unable to do work or household chores, adding that the note "is for a legal issue that does not relate to [Loiselle's] medical situation." The Commissioner thus implies that Chiasson was overstating Loiselle's limitations so that Loiselle would gain some legal benefit.

Although the Commissioner raises this question in the context of his arguments regarding Chiasson's complaints about her pain, the Commissioner appears to be challenging Chiasson's credibility, not Loiselle's. The Commissioner invites the inference that, if Chiasson overstated Loiselle's limitations at one point, then all other assessments of Loiselle by Chiasson are suspect. Assuming this inference is appropriate, the ALJ did not make it in his decision; to the contrary, he relied on Chiasson's notes from June 2003. For these reasons, Chiasson's February 2003 note is immaterial here.

C.       **Vocational Hypothetical**

Loiselle asserts that, because the ALJ improperly weighed the medical evidence and her subjective complaints of pain, the ALJ's assessment of Loiselle's ability to work—as expressed in the vocational hypothetical—is not supported by substantial evidence.

This Court agrees that, without substantial evidence to support the ALJ's findings on the claimant's ability to work, the vocational hypothetical is not supported by substantial evidence either.  *See Grisson v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005).  The ordinary remedy, under these circumstances, is to reverse and remand to the ALJ for further proceedings, and this Court accordingly recommends such relief here.  *See* 42 U.S.C. § 405(g); *Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir. 2000); *Buckner v. Apfel*, 213 F.3d 1006, 1010-11 (8th Cir. 2000).

## III.   CONCLUSION AND RECOMMENDATION

The ALJ credited testimony by a non-treating physician, and discredited testimony by a treating physician, without sufficient basis in the medical record.  And when the ALJ assessed Loiselle's subjective complaints of pain, the ALJ made findings about her daily activities and her tolerance for pain medications that were not reasonably supported by relevant evidence.

When the ALJ assessed Loiselle's ability to work, therefore, the determination was not founded on substantial evidence.  This Court thus concludes that Loiselle's motion for summary judgment is properly granted; the Commissioner's motion conversely be denied; and the decision of the ALJ be reversed and remanded for further proceedings.  Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.   Loiselle's motion for summary judgment (Doc. No. 6) be **GRANTED.**

2.   The Commissioner's motion for summary judgment (Doc. No. 9) be **DENIED.**

3.   The ALJ's decision be **REVERSED** and **REMANDED** to the agency for further proceedings consistent with this recommendation.

4.   This litigation be closed and judgment entered.

Dated this 28th day of July, 2008.                   /s        *Jeanne J. Graham*

_____
JEANNE J. GRAHAM
United States Magistrate Judge

**NOTICE**

        Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **August 11, 2008**.  A party may respond to the objections within ten days after service thereof.  Any objections or responses filed under this rule shall not exceed 3,500 words.  The district court judge shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.